# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 25-423

SHERRI TRAMBLE

VERSUS

JOSHUA BRISCOE, ET AL.

**********

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 22-C-10939-B
HONORABLE LAURA T. GARCILLE, DISTRICT JUDGE

**********

## GARY J. ORTEGO
## JUDGE

**********

Court composed of Charles G. Fitzgerald, Gary J. Ortego, and Guy E. Bradberry, Judges.

### MOTION DENIED; JUDGMENT AFFIRMED, AS AMENDED.

**Fitgerald, J.,** dissents in part with assigned reasons, and concurs in part.

**Gerald A. Melchiode**
**Renee S. Melchiode**
**Jeffery B. Struckhoff**
**Trey Williams**
**Dominic A. Ciaccio**
**Melchiode Marks King LLC**
**639 Loyola Ave., Suite 1800**
**New Orleans, LA 70113**
**(504) 336-2880**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Linetec Service, LLC**

**Peter F. Caviness**
**Falgoust & Caviness, LLP**
**505 S. Court Street**
**Opelousas, LA 70570-5001**
**(337) 942-5812**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Linetec Service, LLC**

**Richard C. Stanley**
**Thomas P. Owen, Jr.**
**Margaret L. Manning**
**Stanley Reuter Alford Owen**
**Munson & Paul LLC**
**909 Poydras, Suite 2500**
**New Orleans, LA 70112**
**(504) 523-1580**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Joshua Briscoe**

**Kirk L.  Landry**
**Virginia J. McLin**
**Keogh, Cox & Wilson, Ltd.**
**701 Main Street**
**P. O. Box 1151**
**Baton Rouge, LA 70802**
**(225) 383-3796**
**COUNSEL FOR DEFENDANT/APPELLEE:**
     **Louisiana Construction and Industry Self Insured Fund**

**A.M. "Tony" Clayton**
**Michael P. Fruge**
**Clayton, Fruge & Ward**
**3741 Highway 1 South**
**Port Allen, LA 70767**
**(225) 344-7000**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
     **Jacob Tramble, Curator for Sherri Tramble**

Shannon H. Eldridge
Cannon and Livermore, LLC
122 Village Street
Slidell, LA 70458
(985) 661-1567
COUNSEL FOR DEFENDANT/APPELLEE:
    Arch Insurance Company

Isaac H. Ryan
Ike Ryan,  APLC
1100 Poydras Street, Suite 2905
New Orleans, LA 70162
(504) 952-0505
COUNSEL FOR DEFENDANT/APPELLANT:
    Linetec Service, LLC

Thomas P. Owen, Jr.
Stanley, Flanagan & Reuter
909 Poydras Street, Suite 2500
New Orleans, LA 70112
(504) 523-1580
COUNSEL FOR DEFENDANT/APPELLANT:
    Joshua Briscoe

Jeffery B. Struckhoff
Melchiode,  Marks,  King,  LLC
639 Loyola Ave., Suite 1800
New Orleans, LA 70113
(504) 336-2880
COUNSEL FOR DEFENDANT/APPELLANT:
    Linetec Service, LLC

Andy Dupre
Ilijana Todorovic
The Dupre Law Firm, LLC
521 Valmont Street
New Orleans, LA 70115
(985) 855-2553
COUNSEL FOR PLAINTIFF/APPELLEE:
    Jacob Tramble, Curator for Sherri Tramble

Robert Irwin Siegel
Morgan A. Druhan
Rachel G. Webre
William P. Worsley
Laborde Siegel, LLC
701 Poydras Street, Suite 4800
New Orleans, LA 70139
(504) 654-1322
COUNSEL FOR DEFENDANT/APPELLEE:
    Arch Insurance Company

**Richard Zimmerman, III**
**Misti Landry Bryant**
**Justin R. Glenn**
**Brian C. Colomb**
**Gordon McKernan  Injury Attorneys**
**5656 Hilton Ave.**
**Baton Rouge, LA 70808**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
 **Jacob Tramble, Curator for Sherri Tramble**

**ORTEGO, Judge.**

This case involves a motor vehicle accident between an emergency vehicle and a truck driven by an employee within the course and scope of his employment. The emergency medical technician (EMT) in the back of the emergency vehicle sustained serious injuries as a result of the accident. The EMT was later interdicted with her husband appointed as curator.

The curator sued on behalf of the EMT against the driver of the truck, his employer, and their insurance companies. Some of the insurance companies settled with the curator just prior to trial commencing. After a trial, the jury found the defendant driver 100% at fault for the accident and awarded the Plaintiff damages totaling $219,742,924.31. A second amended judgment was signed on October 4, 2025.

The defendant driver of the truck and his employer appeal raising issues related to denial of a motion for a continuance based on due process, pretrial exclusion of an expert, pretrial exclusion of discovery, improper jury instructions, denial of a motion for mistrial, excessive general damages, excessive future medical expenses, and improper failure to note a settlement in the judgment.

Plaintiff/Curator moves to have the employer's appeal dismissed based on an unconditional tender issued during the trial, prior to the jury reaching a verdict.

## FACTS AND PROCEDURAL HISTORY

This lawsuit arises out of a motor vehicle accident that occurred on July 8, 2021, on Louisiana Highway 182 in St. Landry Parish, Louisiana. Sherri Tramble ("Sherri"), an EMT, was attending a patient in the back of a 2019 Ram Express ambulance driven by Margo Bellard. Joshua Briscoe, the driver of a 2019 Chevrolet Silverado, was traveling north crossing Louisiana Highway 182 in order to access the U.S. Interstate 49 entrance ramp.

Plaintiff alleges that Joshua Briscoe failed to yield to the ambulance causing the ambulance to strike the rear right side of the 2019 Chevrolet Silverado. It was stipulated by the parties that Briscoe was in the course and scope of his employment with Linetec Service, LLC at the time of the subject accident, and Linetec Service, LLC is responsible for any negligence and fault of Briscoe in connection with the accident.

Sherri sustained serious personal injuries in the accident including traumatic brain injury, injuries to her neck, back, head, legs, general soreness to her entire body, and other injuries. As a result of the injuries sustained, Sherri was interdicted, and her husband, Jacob Tramble, was appointed as curator. (Hereinafter, "Jacob", as curator, on behalf of Sherri referred to as "Plaintiff.") As curator, Jacob asserted claims on Sherri's behalf seeking recovery for damages she sustained including past, present, and future physical pain and suffering, mental pain and anguish, medical expenses, loss of enjoyment of life, disability, loss of earning capacity, loss of wages, and other items of damages.

Jacob filed suit on Sherri's behalf in the Twenty-Seventh Judicial District Court for the Parish of St. Landry, State of Louisiana, in a legal action entitled "Sherri Tramble v. Joshua Briscoe ("Briscoe"), Linetec Service, LLC ("Linetec"), Arch Insurance Company ("Arch") as liability carrier and UM/UIM carrier" bearing civil action number 22-C-10939-B. (Hereinafter Briscoe, Linetec and Arch are sometimes referred to collectively as "Defendants".) Arch Insurance Company was later removed from the captions of the proceedings for trial purposes pursuant to La.Code Evid. art. 411.

A multitude of pretrial issues relevant to this appeal were filed and deliberated. First, the trial court denied Defendants' motion for continuance asserted on the day trial began. Second, the trial court quashed Defendants' discovery

subpoena and requested use of Sherri's OB/GYN records and subpoena and requested use of American Express' records and call logs. Finally, the trial court excluded the testimony of Defendants' expert, John B. Everlove, as to his opinion regarding seatbelt usage and the standard of care expected of an EMT given that this expert admittedly had no knowledge of the care Sherri was providing the patient, Mr. Kenneth Isles, in the ambulance at the time of the accident.

A jury, after hearing the testimony and evidence during the six-day trial, allocated 100% of the fault for the accident to Joshua Briscoe, and awarded Sherri total damages of $219,910,110,82. However, the trial court reduced the award for past medical expenses from $1,053,176.82 to $885,991.13. A second amended judgment was signed by the trial court on October 4, 2025 for the following damages Sherri incurred:

| | |
|---|---|
| Past medical expenses | $ 885,991.13 |
| Future medical care and expenses | $61,433,984.00 |
| Past lose wages and income | $ 215,447.00 |
| Future lost wages and income | $ 1,707,503.00 |
| Past physical pain and suffering | $20,000,000.00 |
| Future physical pain and suffering | $25,000,000.00 |
| Past mental pain, anguish and emotional distress | $20,000,000.00 |
| Future mental pain, anguish and emotional distress | $25,000,000.00 |
| Loss of enjoyment of life, Past & Future | $60,000,000.00 |
| Disability, Past & Future | $ 5,000,000.00 |
| Scarring | $ 500,000.00 |
| TOTAL: | $219,742,924.13 |

Briscoe and Linetec filed the present appeal alleging a total of fifteen assignments of error[1]. Plaintiff responds by filing a motion to dismiss Linetec's appeal.

## ANCILLARY MATTER

*Motion to Dismiss Appeal*

Plaintiff seeks to have the appeal of Linetec dismissed based on *Griffin v. International Insurance Co.*, 98-431 (La.App. 3 Cir. 10/7/98), 727 So.2d 485, *writ denied*, 99-854 (La. 5/7/99), 741 So.2d 656[2]. In *Griffin*, this court found that the City of Abbeville and its insurer were prohibited from appealing because they voluntarily and unconditionally acquiesced to the trial court's judgment resulting from their trial. The *Griffin* court cited that allowance of an appeal by a judgment debtor in such circumstances would violate La.Code Civ.P. art. 2085, which states:

> An appeal cannot be taken by a party who confessed judgment in the proceedings in the trial court or who voluntarily and unconditionally acquiesced in a judgment rendered against him. Confession of or acquiescence in part of a divisible judgment or in a favorable part of an indivisible judgment does not preclude an appeal as to other parts of such judgment.

"It is universally established that the right of appeal should always be entertained with favor, and that an appeal will be dismissed only where the appellee shows himself clearly entitled to that relief. In cases of doubt, the interpretation will be liberally in favor of the appellant." *Doll v. Dearie*, 39 So.2d 640, 641 (La.App.1949).

> Acquiescence in a judgment is never presumed, and the party alleging abandonment must establish by direct or circumstantial evidence that the party now appealing intended to acquiesce and to abandon his right to appeal. *Major v. Louisiana Department of Highways*, 327 So.2d 515

---

[1] Arch Insurance Company failed to timely file an appeal in this matter

[2] We note that a second Motion to Dismiss this appeal was filed by Plaintiffs after oral arguments, which second motion was denied on 05/27/2026.

(La.App. 1st Cir.1976). Furthermore, appeals are favored in law, and forfeiture of a party's right to appeal through acquiesce[nce] should be decreed only when the party's intention to acquiesce and to abandon his right of appeal is clearly demonstrated. *Kendrick v. Garrene*, 231 La. 462, 91 So.2d 603 (1956).

*Hoyt v. State Farm Mut. Auto. Ins. Co.,* 413 So.2d 1003, 1005 (La.App. 3 Cir.), *writ denied*, 423 So.2d 1180 (La.1982) (alteration added) (quoting *Koerner & Lambert, A Prof'l Law Corp. v. Allstate Ins. Co.,* 363 So.2d 546 (La.App. 4 Cir.1978)).

Here, on September 20, 2024, Linetec filed an ex parte motion for leave to deposit $1,860,203.13, as the remaining limits of Arch's policy limits, into the registry of the court. The motion states the funds were "an unconditional tender by defendants to the Plaintiff JACOB TRAMBLE, as curator for SHERRI TRAMBLE." The motion further stated that the fund "may be withdrawn from the Registry of the Court by the said JACOB TRAMBLE, as curator for SHERRI TRAMBLE, at any time and without any conditions thereon[.]" Finally, the motion reserved to Jacob, as curator for Sherri "any and all rights against LINETEC SERVICE, LLC AND ARCH INSURANCE COMPANY." The trial court granted the motion.

Following the trial, the trial court rendered an initial judgment on October 3, 2024, against Briscoe. Then, on October 4, 2024, the trial court rendered a first amended judgment on October 4, 2024, adding Linetec and Arch as additional judgment debtors.

After reviewing the record, we find that *Griffin* is distinguishable from the matter before us. In *Griffin*, the judgment debtor and the judgment creditor jointly moved to submit the unconditional tender *after* the judgment was rendered. Here, the unconditional tender was an ex parte motion of an eventual judgment debtor, Linetec, submitted *prior* to any judgment being issued. While no rights to appeal

5

were reserved by Linetec, the burden is on Plaintiff to establish that Linetec intended to acquiesce and to abandon its right to appeal.

We are mindful of the language of La.Code Civ.P. art. 2085 that "[a]n appeal cannot be taken by a party who confessed judgment in the proceedings in the trial court." However, La.Code Civ.P. art. 2085 concludes with the following: [c]onfession of . . . part of a divisible judgment or in a favorable part of an indivisible judgment does not preclude an appeal as to other parts of such judgment." Here, there is no indication as to what part of the judgment Linetec confessed, if any.

Further, an unconditional tender may be used by an insurer as an act of good faith to avoid the imposition of penalties and attorneys' fees paying the undisputed part of a claim when the parties still have a reasonable dispute as to the amount of loss. *O'Brian v. Allstate Ins. Co.*, 420 So.2d 1222 (La.App. 3rd Cir.1982). It can also be used to cease the tolling of interest on a judgment rendered. Here, the deposit was made prior to any judgment.

Thus, we find it is just as probable that Linetec made the deposit as an attempt to stop interest from accruing on a possible large judgment or to avoid imposition of penalties and attorney's fees as it was that Linetec was making the deposit as a confession of judgment in the trial court's proceedings to whatever the eventual judgment would entail. Given the directive that appeals are favored in the law, we deny Plaintiff's motion to dismiss Linetec's appeal.

## ASSIGNMENTS OF ERROR BRISCOE

I.    The trial court's refusal to delay the trial when Mr. Briscoe was left without counsel was a denial of due process.

II.   The trial court abused its discretion by excluding the defense expert when comparative fault was at issue.

III.  The trial court committed legal error when it instructed the jury that Louisiana does not have a law requiring a paramedic to wear a seat belt.

IV. The trial court abused its discretion by prohibiting discovery of Ms. Tramble's OB/GYN and American Express records.

V. The trial court committed legal error when it instructed the jury on the *Housley* Presumption and on the interdiction.

VI. The trial court committed legal error when it failed to declare a mistrial once the jury was reduced to eleven members.

VII. The damage award was grossly excessive in relation to the injuries proven at trial and should have been remitted or vacated. The trial court should have granted either the motion for new trial or the motion for judgment not withstanding the verdict.

VIII. The award for future medical expenses was grossly excessive in relation to the injuries and lifecare plan established at trial and should have been remitted or vacated.

IX. The trial court committed legal error by ignoring La. Civil Code article 3071 and refusing to incorporate the *Gasquet* settlement into the Judgment.

## ASSIGNMENTS OF ERROR LINETEC

1. The general damages award is grossly excessive.

2. The award for future medical expenses is grossly excessive.

3. The district court erred in failing to order a mistrial when the parties did not agree to proceed with fewer than twelve jurors.

4. The district court improperly excluded expert testimony regarding an EMT's standard of care.

5. The district court gave erroneous jury instructions which prejudiced the jury's findings on comparative fault, causation, and disability.

6. The district court ignored La.Civ. Code Art. 3071, and it improperly refused to incorporate the *Gasquet* settlement into the judgment.

## STANDARD OF REVIEW

At issue in this matter are eight distinct issues presented for review.

Following are the standard of review applicable to each:

7

*Denial of Motion for Continuance*

A court's decision whether to grant a continuance is subject to appellate review for abuse of discretion. *Rogers v. Hilltop Ret. & Rehab. Ctr.*, 13-867 (La.App. 3 Cir. 2/12/14), 153 So.3d 1053.

*Exclusion of Expert*

A court's decision whether to exclude an expert witness is subject to appellate review for abuse of discretion. *Safeco Ins. Co. of Am. v. Chrysler Corp.*, 01-1641 (La.App. 3 Cir. 7/31/12), 834 So.2d 1026.

*Limitation of Pretrial Discovery*

A court's decision in discovery matters is subject to appellate review for abuse of discretion. *Arterburn v. Arterburn*, 15-22 (La.App. 3 Cir. 10/7/15), 176 So.3d 1163.

*Improper Jury Instructions*

The manifest error standard of review is applicable when an appellate court is reviewing jury instructions. *Johnson v. First Nat. Bank of Shreveport*, 00-870 (La.App. 3 Cir. 6/20/01), 792 So.2d 33, *writs denied*, 01-2770, 01-2783 (La. 1/4/02), 805 So.2d 212, 213.

*Denial of Motion for Mistrial*

A court's decision whether to grant a mistrial is subject to appellate review for abuse of discretion. *Gotch v. Scooby's ASAP Towing, LLC*, 19-30 (La. 6/26/19), 285 So.3d 459.

*General Damages Award*

The quantum a trier of fact awards for general damages is subject to appellate review for abuse of discretion. *Pete v. Boland Marine and Mfg. Co., LLC*, 23-170 (La. 10/20/23), 379 So.3d 636.

*Special Damages Award - Future Medical Expenses*

Future medical expenses are special damages subject to the manifest error standard of review. *Kaiser v. Hardin*, 06-2092 (La. 4/11/07), 953 So.2d 802.

*Application of Louisiana Civil Code Article 3071*

A compromise is a contract, and the language of a contract's interpretation is a question of law subject to de novo review whereas factual determinations regarding the contract are reviewed under manifest error standard of review. La.Civ.Code art. 3071; *Jeanerette Lumber & Shingle Co., LLC v. Shell Oil Co.*, 25-67 (La.App. 3 Cir. 9/24/25), 420 So.3d 858, *writ denied*, 25-1356 (La. 1/21/26), 425 So.3d 106.

## LAW AND DISCUSSION

In this matter, while there are fifteen assignments of errors raised between Defendants, there is overlap between the issues raised in each Defendant's respective assignments of error. As such, we will address arguments related to a single issue under each separate heading. In this matter there are eight distinctive issues raised as assignments of error.

### ISSUE NUMBER ONE: Denial of Motion for Continuance and Due Process

Briscoe's first assigned error is that the trial court's denial of Defendants' motion for continuance was a denial of his due process rights. Briscoe bases his assertion on the proposition that he was left without counsel after a settlement was announced just prior to the trial commencing and counsel for those defendants privy to the settlement did not participate in the proceedings after leaving the courtroom.

"A continuance may be granted in any case if there is good ground therefor." La.Code Civ.P. art. 1601. As previously stated, the trial court's decision whether to grant a continuance is reviewed for abuse of discretion. *Newsome v. Homer Mem'l Med. Ctr.*, 10-564 (La.4/9/10), 32 So.3d 800. The trial court may take into

consideration such factors as diligence, good faith, reasonable grounds, fairness to both parties and the need for the orderly administration of justice. *Ardoin v. Bourgeois*, 04-1663 (La.App. 3 Cir. 11/2/05), 916 So.2d 329.

In the case before us, pleadings in the record show that Gerald A. Melchiode signed a pleading entitled "NOTICE OF ENROLLMENT OF ADDITIONAL COUNSEL OF RECORD" as "Counsel for Defendants Joshua Briscoe, Linetec Service, LLC and Arch Insurance Company." Mr. Melchiode was present throughout the trial. Further, Peter Caviness of Falgoust & Caviness, LLP, appears as counsel of record for Briscoe and was present at trial. Thus, contrary to his argument, Briscoe was represented by counsel at trial. Accordingly, we find no abuse of the trial court's discretion in denying Defendants' motion for continuance requested on the day the trial commenced on the basis that Briscoe would not be represented. This issue presented is without merit.

### ISSUE NUMBER TWO: Exclusion of Expert

Defendants assert in separate assignments of error that the trial court abused its discretion by excluding the defense expert, John B. Everlove, when comparative fault was at issue and his testimony was relevant regarding an EMT's standard of care. According to Defendants, the trial court's granting Plaintiff's Daubert motion in limine to exclude the testimony of their expert, John B. Everlove, was in error.

This court, in *Tramble v. Briscoe*, 24-481 (La.App. 3 Cir. 9/12/24), (unpublished writ wherein the writ was granted, considered, and denied), *writ denied*, 24-1128 (La. 9/17/24), 392 So.3d 894, considered this issue raised by Defendants.

> The law of the case principle relates to (a) the binding force of trial court rulings during later stages of the trial, (b) the conclusive effects of appellate rulings at the trial on remand, and (c) the rule that an appellate court will ordinarily not reconsider its own rulings of law on a subsequent appeal in the same case.

10

*Petition of Sewerage & Water Bd. of New Orleans*, 278 So.2d 81, 83 (La.1973).

The law of the case doctrine is discretionary, not a rigidly applied mandate. *State v. La. Land & Expl. Co.*, 20-685 (La. 6/30/21), 347 So.3d 684, *aff'd on reh'g*, 20-685 (La. 6/1/22), 339 So.3d 1163.

> The law of the case doctrine "recognizes the binding force of trial court rulings during later stages of the trial...." *Pitre v. Louisiana Tech University*, 26,388, p. 1 (La.App. 2 Cir. 5/10/95); 655 So.2d 659, 664, *writs granted*, 95-1466, 95-1487 (La.10/6/95); 661 So.2d 454, *reversed on merits*, 95-1466, 95-1487 (La.5/10/96); 673 So.2d 585; see also *Day v. Campbell–Grosjean Roofing & Sheet Metal Corp.*, 260 La. 325, 256 So.2d 105 (1971). The reasons for this doctrine are: (1) avoidance of indefinite litigations; (2) consistency of results in same litigation; (3) essential fairness between the parties; and, (4) judicial efficiency. Furthermore, the doctrine applies only where the facts and issues remain substantially the same and the parties to the litigation had their day in court. Alternatively, the principle of res judicata provides for the preclusive effect of a judgment, once valid and final, on the same parties concerning the same issue. *Terrebonne Fuel & Lube, Inc. v. Placid Refining Co.*, 95-654, 95-671 (La.1/16/96); 666 So.2d 624. See La.R.S. 13:4231.

*Johnson v. Acadiana Ry. Co.*, 96-263, p. 4 (La.App. 3 Cir. 4/16/97), 693 So.2d 226, 228-29.

Here, we exercise the law of the case doctrine to find no merit in this assignment of error. In this appeal, Defendants contest the same trial court ruling presented for our review in the prior writ application asserting the same arguments, i.e., had expert Everlove's opinion that the standard of care for a EMT riding in the rear of an ambulance is to wear a seat belt when not caring for the patient, the jury could have found Sherri partially at fault for not wearing her seat belt at the time of the accident.

We have reviewed both the record before us in this appeal and the applicable law. As before in the writ application, the evidence in the record is that there is no law requiring an EMT tending to a patient to use a seat belt, there is no evidence that expert Everlove knew whether Sherri was standing, seated or tending to the patient

11

at the time of the accident, and there is no evidence that Sherri was not tending to the patient at the time of the accident. Additionally, it is clear from Everlove's deposition testimony that he did not have any knowledge of circumstances present in the back of the ambulance prior to the accident. Thus, any opinion by Defendants' expert as to whether Sherri breached any alleged standard of care of an EMT under the circumstances present would be of no value.

Moreover, any opinion that Sherri was at fault for the accident for lack of seat belt usage is rendered meritless by the undisputed circumstances of the accident and the training Saint Landry EMS provided regarding seat belt usage. At the time of the accident, Margo Bellard was driving the ambulance while Krystle Johnson was riding in the front and Sherri was in the back with the patient, Mr. Kenneth Isles.

Both Johnson and Bellard testified that while a patient is in the back of the ambulance, it is proper to be unrestrained when doing active care on the patient. Bellard testified to the following:

> Q. And Ms. Johnson told the jury that when she was trained by St. Landry EMS, they trained her on when she should and shouldn't wear seatbelt [sic] in the back of the ambulance. Did you receive similar training?
>
> A. Correct.
>
> Q. And she told the jury that while she's doing that, or while somebody in the back of the ambulance is doing active care on a patient, it's okay for them to not be restrained while they're providing that care. Is that the same treatment-
>
> A. Correct.
>
> Q. ...training that you got?
>
> A. mm-hmm. [affirmative]

Additionally, Bellard testified that it was not possible for an EMT to provide care to a patient while buckled in the seat where Sherri was seated. Bellard also

testified that the patient, Mr. Isles, iterated that Sherri was administering care to him when the wreck happened. These testimonies are undisputed.

Accordingly, we find no error in our disposition of Defendants' previous writ application and no merit to this issue raised again on appeal for review. Therefore, we find the trial court was within its discretion to exclude the testimony of Defendants' expert, John B. Everlove.

### ISSUE NUMBER THREE: *Limitation of Pretrial Discovery*

Defendants argue that the trial court abused its discretion by quashing the subpoena and prohibiting the discovery and use of Sherri's OB/GYN records. Further, Defendants assert the trial court erred in prohibiting discovery and use of Sherri and/or Jacob's records and call logs with American Express.

> A trial court has broad discretion in handling discovery matters and an appellate court should not upset a ruling absent an abuse of discretion. *Sercovich v. Sercovich*, (La.App. 4 Cir. 6/13/12), 96 So.3d 600, 603. Under this abuse of discretion standard of review, "[a]n appellate court must balance the information sought in light of the factual issues involved and the hardships that would be caused by the court's order when determining whether the trial court erred in ruling on a discovery order." *Id.*, citing *Wollerson v. Wollerson*, 29,183, p. 2 (La.App. 2 Cir. 1/22/97), 687 So.2d 663, 665.

*Favrot v. Favrot*, 12-1573, p. 4 (La.App. 4 Cir. 5/1/13), 115 So.3d 1190, 1193, *writ denied*, 13-1735 (La.11/1/13), 125 So.3d 433. In *Favrot*, the court stated:

> The discoverability test under La. C.C.P. art. 1422 entails first asking whether answering the discovery is feasible and practicable. If that answer is in the affirmative, then the court determines whether an answer to the discovery would "expedite the litigation by either narrowing the area of controversy or avoiding unnecessary testimony or providing a lead to evidence." *Industrial Pipe, Inc. v. Plaquemines Parish Council*, 12-1348, pp. 7-8 (La.App. 4 Cir. 9/14/12), 100 So.3d 896, 900.

*Id.* at 1194.

*Arterburn*, 176 So.3d at 1176-77.

In this case, Defendants sought to obtain Sherri's OB/GYN records and any recordings, records and call logs with American Express regarding a credit card account. The trial court disallowed discovery of those two items.

Regarding Sherri's OB/GYN records, Defendants sought these records to obtain evidence regarding Sherri's inability to communicate. In looking to the record before us, we find little to no hardship caused to Defendants by the trial court disallowing discovery of Sherri's OB/GYN records as related to their attempt to obtain evidence regarding Sherri's ability to communicate. Defendants were able to present this issue to the jury using a multitude of medical records showing that Sherri, at times post-accident, was able to communicate. The probative value of medical records, which were cumulative on this issue, is outweighed by the personal nature of such medical records given that Sherri's reproductive system and its functions were not part of any claims made in this matter. Therefore, we find no abuse of discretion by the trial court in limiting Defendants' discovery of these medical records.

Likewise, we find no abuse of discretion by the trial court limiting Defendants' subpoena and discovery propounded regarding telephone conversations with American Express related to a credit card account. Again, Defendants sought these recordings to show that Sherri was able to communicate post-accident. However, the record, through Jacob's affidavit, establishes that the American Express account is in Jacob's name only, and Jacob was not a party to the litigation. Information regarding charges on Jacob's account made by him would violate his privacy, provide little probative value, and would also be cumulative on this issue as evidence of Sherri's ability to communicate. Moreover, nothing in the record shows whether Sherri or Jacob incurred the charges in question and there was no indication whether Sherri or Jacob communicated with American Express on that day. Finally,

14

recordings of Sherri speaking post-accident were provided to Defendants through other means. Accordingly, we find no merit to this issue raised for review.

**ISSUE NUMBER FOUR: *Improper Jury Instructions***

Defendants argue that the trial court committed legal error when it instructed the jury on Louisiana law regarding EMT seat belt usage, Sherri's interdiction, and the *Housley* Presumption. According to Defendants, the jury instructions on these issues prejudiced the jury's findings on comparative fault, causation, and disability.

Review of jury instructions are made under the manifest error standard of review. *Johnson*, 792 So.2d 33.

> Louisiana Code of Civil Procedure article 1792(B) requires the trial court to instruct jurors on the law applicable to the cause submitted to them. The trial court is responsible for reducing the possibility of confusing the jury and may exercise the right to decide what law is applicable and what law the trial court deems inappropriate. *Baxter v. Sonat Offshore Drilling Inc.*, 98-1054, p. 6 (La.App. 1 Cir. 5/14/99), 734 So.2d 901, 906.

> Adequate jury instructions are those which fairly and reasonably point out the issues and which provide correct principles of law for the jury to apply to those issues. The trial judge is under no obligation to give any specific jury instructions that may be submitted by either party; the judge must, however, correctly charge the jury. If the trial court omits an applicable, essential legal principle, its instruction does not adequately set forth the issues to be decided by the jury and may constitute reversible error. *Doyle v. Picadilly Cafeterias*, 576 So.2d 1143, 1152 (La.App. 3 Cir.1991).

> Correlative to the judge's duty to charge the jury as to the law applicable in a case is a responsibility to require that the jury receives only the correct law. *Melancon v. Sunshine Construction, Inc.*, 97-1167, p. 6 (La.App. 1 Cir. 5/15/98), 712 So.2d 1011, 1016; Doyle, 576 So.2d at 1152.

> Louisiana jurisprudence is well established that an appellate court must exercise great restraint before it reverses a jury verdict because of erroneous jury instructions. Trial courts are given broad discretion in formulating jury instructions and a trial court judgment should not be reversed so long as the charge correctly states the substance of the law. The rule of law requiring an appellate court to exercise great restraint before upsetting a jury verdict is based, in part, on respect for the jury determination rendered by citizens chosen from the community who serve a valuable role in the judicial system. We

15

assume a jury will not disregard its sworn duty and be improperly motivated. We assume a jury will render a decision based on the evidence and the totality of the instructions provided by the judge.

However, when a jury is erroneously instructed and the error probably contributed to the verdict, an appellate court must set aside the verdict. In the assessment of an alleged erroneous jury instruction, it is the duty of the reviewing court to assess such impropriety in light of the entire jury charge to determine if the charges adequately provide the correct principles of law as applied to the issues framed in the pleadings and the evidence and whether the charges adequately guided the jury in its deliberation. Ultimately, the determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice. *Nicholas v. Allstate Insurance Company*, 99-2522, (La. 8/31/00), 765 So.2d 1017, 1023; see also *Brown v. White*, 405 So.2d 555, 560 (La.App. 4 Cir.1981), *rev'd on other grounds on reh'g*, 430 So.2d 16 (La.1983) (the question is whether the jury was misled to the extent that it was prevented from doing justice) and *Jones v. Liberty Mutual Insurance Company*, 568 So.2d 1091, 1094 (La.App. 5 Cir.1990), *writ denied*, 572 So.2d 72 (1991) (reversible error occurs here when the jury is misled to such an extent as to prevent it from doing justice).

Determining whether an erroneous jury instruction has been given requires a comparison of the degree of error with the jury instructions as a whole and the circumstances of the case. See *Belle Pass Terminal, Inc. v. Jolin, Inc.*, 634 So.2d 466 (La.App. 1 Cir.), *writs denied*, 638 So.2d 1094 (La.1994). Because the adequacy of jury instruction must be determined in the light of jury instructions as a whole, when small portions of the instructions are isolated from the context and are erroneous, error is not necessarily prejudicial. Furthermore, the manifest error standard for appellate review may not be ignored unless the jury charges were so incorrect or so inadequate as to preclude the jury from reaching a verdict based on the law and facts. Thus, on appellate review of a jury trial the mere discovery of an error in the judge's instructions does not of itself justify the appellate court conducting the equivalent of a trial de novo, without first measuring the gravity or degree of error and considering the instructions as a whole and the circumstances of the case. *Brown*, 405 So.2d at 558.

*Adams v. Rhodia, Inc.*, 07-2110. pp. 5-9 (La. 5/21/08), 983 So.2d 798, 804-05.

Here, Defendants challenge the jury instructions regarding Louisiana seat belt

law and EMTs, Sherri's interdiction, along with the presumption found in *Housley*

*v. Cerise*, 90-2304, 90-2324 (La. 1991), 579 So.2d 973. According to Defendants,

the instruction regarding Louisiana seat belt law and EMTs prevented the jury from

finding comparative fault by Sherri. Next, Defendants argue that the instruction

regarding interdiction removed from the jury's deliberations questions of whether Sherri could care for herself. Finally, Defendants argue that the instruction regarding the *Housley* presumption removed from the jury's deliberations whether the accident caused Sherri's injuries and symptoms. Thus, Defendants argue that these three instructions effectively left the jury no choice but to find Briscoe 100% at fault for Sherri's mental and physical decline.

*Jury Instruction re: Louisiana Seat Belt Law and EMTs*

Defendants assert an error by the trial court in instructing the jury that "[t]here is no law in Louisiana that says a paramedic shall be buckled." According to Defendants, this instruction guided the jury to conclude that Sherri acted reasonably in all circumstances related to the accident regardless that Sherri was not wearing a seat belt at the time of the accident.

We find this instruction by the trial court is an accurate statement of Louisiana law. This is echoed by Defendants' counsel when discussing the merits of Plaintiff's motion to exclude the testimony of John B. Everlove regarding the reasonableness of Sherri's lack of use of a seat belt wherein he stated, "First of all . . . we're here to say that there is no law. There's no law in Louisiana that says a paramedic has to be buckled." As noted above, a judgment should not be reversed so long as the charge made by the trial court correctly states the substance of the law. *Adams*, 983 So.2d 798.

We do note that the lack of a Louisiana traffic statute on seat belt usage for EMTs, while relevant to consideration of negligence per se, is not germane to general negligence and one's civil duty to minimize damages or being found at fault regarding whether one acted reasonably. This is a subtle difference, and it is arguable that inclusion of the instruction could have potential to confuse a jury on the issue.

17

Nevertheless, a review of the record shows that the allocation of fault was vigorously disputed by the parties and evidence of fault as to all parties, including Sherri, was presented to the jury over a six-day trial. Given the debate of the allocation of fault during the trial, it would be clear to any jury that Sherri was not immune from fault by law. Additionally, we find the jury's allocation of 0% fault to Sherri was reasonable as it is supported by the evidence in the record. Margo Bellard, a fellow EMT driving the ambulance when the accident occurred, stated she "witnessed Ms. Tramble buckled in the back before I shut the door." Bellard further stated that she had sat where Sherri was seated, at the head of the patient, and that one could not be buckled and give care to the patient. Finally, according to Bellard, the patient, Mr. Kenneth Isles, stated to her that Sherri was administering care to him when the wreck happened.

Additionally, the trial court, otherwise addressing seat belt usage, stated that Defendants "asserted that this accident, in part, was caused by the negligence of St. Landry EMS, Sherri Tramble's employer, based on their allegations that St. Landry EMS failed to properly train Sherri Tramble and other employees on the usage of seatbelts while riding as a paramedic in an ambulance." Thus, the jury was aware Sherri's seat belt usage could have been a basis for it to allocate fault to Sherri.

In viewing the instruction in light of the entirety of the jury instructions, we cannot say that the trial court abused its "broad" discretion. Therefore, given the totality of the jury instruction on this issue and the undisputed, relevant testimony of Ms. Bellard, we cannot say that the jury was misled so as to prevent justice from being dispensed on the issue of whether the jury could find Sherri comparatively at fault for her injuries for her alleged lack of seat belt usage.

*Jury Instruction re: Sherri's Interdiction*

Regarding Sherri's interdiction, the trial court stated (emphasis added):

A Court may order the full interdiction of a natural person of the age of majority, like Mrs. Tramble who, due to the infirmity, is unable consistently to make reason[ed] decisions regarding the care of her person and property, or to communicate those decisions, and [whose] interest cannot be protected by less restrictive means. It is a declaration that the interdict is incapable of caring for herself or her estate. When an interdiction is granted, like in this case, the Court must appoint a curator, and an undercurator. The Court has appointed Jacob Tramble as the curator for Mrs. Tramble who will prosecute her claims against the Defendants in this case. *This determination about Ms. Tramble's interdiction was made by a Court other than this one, but her ability to care for herself, or her estate, is still a factual issue for the jury, you guys, to decide today*.

Defendants argue that this instruction didn't allow the jury to determine whether Sherri's abilities and disabilities allowed her to make or communicate decisions about herself and her property. This argument is directly contradicted by the plain reading of the trial court's instruction stating, "[T]his determination about Ms. Tramble's interdiction was made by a Court other than this one, but her ability to care for herself, or her estate, is still a factual issue for the jury, you guys, to decide today." Prior to this part of the instructions, the trial court accurately stated the law and the impact of a person being interdicted. It was a fact that Sherri had been interdicted. Clearly, the jury was aware of this interdiction given that Jacob had to bring the suit on Sherri's behalf.

Given the totality of the jury instruction on this issue, we cannot say that the jury was misled to where justice was prevented from being dispensed on the issue of whether Sherri could care for herself. Thus, we find the trial court accurately stated the law and further directed the jury that it would have to make a factual determination on this issue.

*Jury Instruction re: Housley Presumption*

Regarding the *Housley* presumption instruction, the trial court stated:

> The Plaintiff is aided in his burden of proving causation by the presumption that the Plaintiff's disability is presumed to have resulted from an accident, if before the accident the Plaintiff was in good health, but commencing with the accident, the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there will be a reasonable possibility of causal connection between the accident and the disabling condition.

Defendants argue that this instruction was inappropriate because, here, Sherri's condition improved after the accident before deteriorating. Thus, according to Defendants, the *Housley* presumption could not be applied and reading it to the jury was in error.

It is clear from our reading of the instructions that the trial court was merely delineating law regarding a presumption that existed at that time and in no way indicated that the *Housley* presumption applied to this case unless the jury found the predicated facts necessary for its application. The trial court clearly expressed facts that must exist prior to application of the presumption and did not indicate that such facts existed in this matter. The trial court went on to state that the jury "can assign any percentage of fault to the Plaintiff or to any or all of the Defendants that you want." The trial court also stated that if the jury decides "that the Plaintiff was comparatively negligent, and brought any of the damages or injuries, you must then decide how much, or what percentage, that conduct contributed to those injuries."

Given the totality of the jury instruction on this issue, we find Defendants' assertion that this instruction left the jury no choice but to find Briscoe 100% at fault for Sherri's mental and physical decline to be without merit. We cannot say that the jury was misled to where justice was prevented from being dispensed on the issue

20

of whether Briscoe caused Sherri's injuries or conditions. Here, the jury heard conflicting evidence on the issues of allocation of fault and causation. Additionally, there is no evidence that these findings of fact on these issues were impacted by the trial court's jury instructions regarding Louisiana law relative to seat belt usage by EMT's, Sherri's interdiction, or the predicate facts necessary to apply the *Housley* presumption.

In summary, after a thorough review of the jury instructions regarding the impact of Sherri's interdictions, the existence of the *Housley* presumption, and Louisiana law regarding EMT seat belt usage, we find no manifest error by the trial court in instructing the jury. Therefore, we find the issue(s) of improper jury instructions presented for review have no merit.

### ISSUE NUMBER FIVE: *Denial of Motion for Mistrial*

Defendants contend that the trial court committed legal error when it denied their motion for a mistrial once the jury was reduced to eleven members. According to Defendants, they must stipulate to continuing a jury trial with fewer than twelve jurors, and they did not do so.

> It is well established that a motion for mistrial in a civil case should be granted under the following circumstances: (1) when the trial court determines that it is impossible to reach a proper judgment because of some error or irregularity; and (2) where no other remedy would provide relief to the moving party. A trial court has great discretion in determining whether to grant a mistrial, since mistrials are not a matter of right. Furthermore, the trial court has vast discretion in the manner in which proceedings are conducted, and it is only upon a showing of a gross abuse of discretion that appellate courts will intervene.

*Cavalier v. State, ex rel. Dept. of Transp. & Development*, 08-561, p. 9 (La.App. 1 Cir. 9/12/08), 994 So.2d 635, 642 (citations omitted).

Louisiana Code of Civil Procedure Article 1761 provides as follows:

> A. In cases to be tried by jury, twelve jurors summoned in accordance with law shall be chosen by lot to try the issues specified

unless the parties stipulate that the case shall be tried by six jurors. The method of calling and drawing by lot shall be at the discretion of the court.

B. The parties may stipulate that if one or more jurors die or become disqualified the remaining jurors shall try the issues specified.

Defendants argue that Article 1761(A) mandates that twelve jurors summoned "try the issues" with two specific exceptions. The first is when the parties choose to have it tried by six jurors. The second is when the parties choose to allow less than twelve if one or more jurors can no longer serve due to specific circumstances. Relevant to this case, Defendants argue that the language of Article 1761(B) gives litigants a statutory right to choose whether to submit issues of their case to less than twelve jurors.

However, this exact argument was rejected by the First Circuit Court of Appeal in *Cavalier*, 994 So.2d 635. In *Cavalier*, the DOTD argued that courts have no discretion under La.Code Civ.P.art 1761 and, as such, because the parties did not stipulate to proceeding with less than twelve jurors, the trial court erred in denying its motion for mistrial. The court in *Cavalier* found that the term "may" in Article 1761(B) does not mandate stipulation by the parties before a trial continues with less than twelve jurors nor does it limit the court's discretion to proceed with the remaining jurors.

Rather, the court in *Cavalier* deliberated whether the trial court acted in a reasonably prudent manner in discharging the twelfth juror and whether DOTD could prove it was prejudiced by the release of the twelfth juror. Additionally, the court in *Cavalier* noted that the trial court evaluated the likelihood of a fair trial and verdict with the remaining eleven jurors and considered relevant factors in deciding to proceed with less than twelve jurors. Such factors included the length of time the parties had waited to have the trial, the distances witnesses traveled for the trial, and

22

how far along the proceedings were in the trial. Ultimately, the court in *Cavalier* determined that proceeding with less than twelve members on the jury was appropriate in the case under a trial court's discretionary power as stated in La.Code Civ.P. art. 1631(A) which provides that "[t]he court has the power to require that the proceedings shall be conducted with dignity and in an orderly and expeditious manner, and to control the proceedings at the trial, so that justice is done." We agree with the analysis provided by our sister court in the necessity of the trial court's deliberation of this issue.

Here, on the third day of a six-day trial, the trial court dismissed the twelfth juror. It did so only after the juror, without waiting for acknowledgment, expressed aloud a need to step out, an inability to walk, and complained about being dizzy and hot. In response, the trial court took a recess. During that recess, the juror fainted and left via ambulance. When the trial resumed, the trial court excused the juror because neither the trial court nor the parties had any indication that the juror's recovery was plausible in order to continue to serve. Given the unique and particular facts present when the trial court dismissed the twelfth juror, we find that the trial court acted in a reasonably prudent manner in discharging the twelfth juror for hardship in this case.

We further note that in response to the trial court's statement that the twelfth juror was going to be dismissed, Defendants failed to object to the trial court releasing the twelfth juror. Rather, they moved for a mistrial. After deliberating, the trial court denied/overruled the motion for a mistrial based on it's finding that dismissal of the twelfth juror did not prevent the jury from reaching a proper verdict or prevent Defendants from having a remedy in the matter citing *Cavalier*. In objecting to the ruling, Defendants cited the Louisiana Code of Civil Procedure articles above arguing that proceeding with less than twelve jurors must be stipulated

23

by them and that they refused to stipulate to proceeding because of various rulings addressed in this opinion that went against them. However, Defendants presented no evidence at that hearing or in this appeal that they were actually prejudiced by the release of the twelfth juror, relying solely on La.Code Civ.P.art. 1761. Thus, we find no evidence that Defendants were prejudiced by the release of the twelfth juror.

It is clear from the record that the trial court carefully and properly evaluated the likelihood of a fair trial and verdict with the remaining eleven jurors, and considered the relevant factors in deciding to proceed with less than twelve jurors such as the basis for dismissing the twelfth juror, the length of time between the time of the incident at issue and the trial, and how far along the proceedings were in the trial.

Based on the analysis provided by our sister court in *Cavalier*, 994 So.2d 635, we find no abuse of discretion by the trial court in its evaluation and finding that an eleven-member jury was sufficient for a fair trial in this case. Accordingly, we find no merit to Defendants' issue raised for review that the eleven-member jury was inappropriate in this instance.

### ISSUE NUMBER SIX: *General Damages Award*

The Defendants' central issue in this appeal centers around the jury's general damages awarded to Sherri. In the case before us, the jury's general damage award totals $155,500,000.00.

Defendants assert that the general damages award is grossly excessive in relation to the injuries proven at trial. They argue that the general damages should have been remitted or vacated by the trial court granting either the motion for new trial or the motion for judgment not withstanding the verdict.

As stated above, the standard of reviewing general damages is abuse of discretion. *Pete*, 379 So.3d 636. Evaluation of whether the trier of fact abused its

discretion includes a consideration of prior awards in similar cases coupled with the particular facts and circumstances of the case under review. "General damage awards must not be 'obviously the result of passion or prejudice, and they [should] bear a reasonable relationship to the elements of the proved damages.'" *Barber Bros. Contracting Co., LLC v. Capital City Produce Co., LLC*, 23-788p.4 (La.12/19/24), 397 So.3d 404, 408 (quoting *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1261 (La. 1993) (alterations in original) (this case hereinafter referred to as *Barber II*).

In delineating how courts are to apply the standard of reviewing general damages put forth in *Pete*, 379 So.3d 636, the supreme court in *Barber II*, prior to reinstating the jury's general damage award of $10,750,000.00, iterated:

> A jury award rests on the "wisdom of the crowd," and thus is accorded much deference. *Eastman v. State Farm Mut. Auto. Ins. Co.*, 2023-1107, p. 1 (La. 5/1/24), 384 So.3d 865, 868. Indeed, we observe that, in large part, the above-described prior awards were determined by a jury and were not altered on appellate review.
>
> Considering the well-documented facts and circumstances particular to this case, in conjunction with a review of prior awards, we cannot conclude that "a rational trier of fact could not have fixed the award[ ] of general damages at the level set by" this jury. *Youn*, 623 So.2d at 1261. The jury's general damages award was not "the result of passion or prejudice," but rather bore a reasonable relationship to the damages which are supported in the evidence presented at trial. *Id*. Therefore, on rehearing we find the jury's award in this case does not "shock the conscience," and does not constitute an abuse of discretion.

*Barber II*, 397 So.3d at 416.

Per *Pete* and the applicable standard of review, our starting point is to consider prior awards in similar cases when reviewing general damages for an abuse of discretion.

*Abuse of Discretion: Prior Awards*

Plaintiff argues that the general damages awarded by the jury were not excessive. Plaintiff supports the argument by citing *Marable v. Empire Truck Sales*

25

*of Louisiana, LLC*, 16-876, 16-877, 16-878 (La.App. 4 Cir. 6/23/17), 221 So.3d 880, *writ denied*, 17-1469 (La. 11/13/17), 230 So.3d 210. In *Marable*, a $40,000,000.00 general damages award was affirmed by the appellate court, with the supreme court denying writs. The Plaintiff in *Marable* was a sixty-four old with an anoxic brain injury leaving her in a permanent, minimally conscious state requiring twenty-four-hour care for the rest of her life with a remaining life expectancy of twenty-one years. Plaintiff points out that Sherri will endure a greater duration of suffering, as estimated forty plus years versus the anticipated twenty-one years in *Marable*. Additionally, Plaintiff argues that Sherri's suffering for a greater duration will come with a greater severity, as Sherri will be aware of her deterioration, with an inability to communicate, in a fully conscious state, versus the minimally conscious state of the Plaintiff in *Marable*.

Defendants cited a multitude of cases to illustrate the excessiveness of the jury's general damages award highlighting cases from this court or the supreme court ranging from $2,000,000.00–$6,000,000.00 See *DeRosier v. South Louisiana Contractors*, 583 So.2d 531 (La.App. 3 Cir.), *writ denied*, 587 So.2d 700 (La.1991). The $2,000,000.00 in general damages in *DeRosier* was awarded to an eighteen-year-old with a permanent brain injury. See also *Duncan v. Kan. City Ry. Co.*, 00-66 (La. 10/30/00), 773 So.2d 670. The $6,000,000.00 in general damages in *Duncan* was awarded to an eleven-year-old quadriplegic with traumatic brain injury and a host of other medical issues.

*Abuse of Discretion: Particular Facts and Circumstances*

After considering prior awards, we are to consider the particular facts and circumstances of the case before us. The jury in this matter found Sherri free from fault, allocating 100% of the fault for this motor vehicle accident to Briscoe. According to the medical evidence in the record, in summary, Sherri suffered a

severe traumatic brain injury followed by continuing deterioration. Sherri will require twenty-four-hour care for the rest of her life, which is expected to be over forty years, from forty-three years of age to seventy-seven years of age as testified to by experts Stony Landry and John Theriot.

Specifically, Sherri was unresponsive after the accident wherein she suffered skull fractures and subarachnoid brain hemorrhage involving the bilateral frontal lobes, left parietal lobe, and left occipital lobe. After having undergone extensive evaluation, cognitive testing, and cognitive retraining as well as occupational therapy, speech therapy, and physical therapy, Sherri continues to decline cognitively and physically with right hemiparesis as well as signs and symptoms of posttraumatic Parkinson-like syndrome. On neuropsychological evaluation, Sherri has difficulties in multiple areas, including areas of verbal and abstract reasoning, difficulty with problem solving, difficulty processing, especially visual stimuli, variable attention problems, and impaired working memory. She is developing a progressive worsening of her gait due to right-sided dysfunction. Sherri also has expressive and receptive aphasia that limits her speech abilities severely. She meets the standard for major neurocognitive disorders secondary to her traumatic brain injury. Sherri also meets the standards for moderate severity dementia secondary to her traumatic brain injury. Sherri took the stand at trial and her scant testimony follows:

Q. Tell the jury your name?
A. Sherri.

Q. Your last name?
A. Tramble (talking very low).

Q. Tramble, and who are you married to? Right here?
A. (She points to Jacob Tramble.)

Q. Do you want this jury to give you sympathy?
A. No.

> Q. Do you want them to give you charity?
>
> A. No.
>
> Q. Tell them what you want. What you want them to do?
>
> A. I want my life back (crying and very, very upset.)

At this point in the proceedings, Sherri was unable to continue. No further questions were asked of Sherri who was then taken from the courtroom by Jacob, and court was adjourned for the day. Additionally, Sherri's treating physicians testified that her physical and mental condition would continue to deteriorate over time.

*Abuse of Discretion: Determination*

Above, we first reviewed the awards in similar cases. Next, we looked at the particular facts and circumstances of the case before us. Now, we must use our review of those two items to determine whether the jury abused its discretion in awarding $155,500,000.00 of general damages to Sheri.

Thus, we are directed by *Pete*, 379 So.3d 636, to again consider prior awards along with the particular facts of this case to determine the highest amount of general damages award the jury reasonably had within its discretion. If abuse of discretion is found, the appellate court then considers those prior awards to determine "the highest or lowest point which is reasonably within that discretion." *Pete*, 379 So.3d 639 (quoting *Jones v. Mkt. Basket Stores, Inc.*, 22-841, p. 16 (La. 3/17/23), 359 So.3d 452, 464.).

*Highest Amount of General Damages: Prior Awards*

This court has previously looked at prior awards in similar cases in our adjudication of whether the jury abused its discretion. We are again directed to look at previous awards in similar cases to determine the highest amount of general damages that was within the jury's discretion, and award damages as such. Rather than limiting ourselves to those cases cited by Plaintiff and Defendants, we will look

28

to those cases cited by the supreme court in *Barber II*, as we find them instructive. The cases reviewed by the supreme court in *Barber II* are as follows:

*Brewer v. J.B. Hunt Transport, Inc.*, 09-1408, 09-1428 (La. 3/16/10), 35 So.3d 230, affirming a jury's general damages award of $2,500,000.00 to a Plaintiff that sustained a traumatic brain injury requiring long-term treatment at a brain-injury facility.

*Jenkins v. State ex rel. Department of Transportation & Development*, 06-1804 (La.App. 1 Cir. 8/19/08), 993 So.2d 749, affirming a jury's general damages award of $3,000,000.00 to a Plaintiff who underwent brain surgery and suffered from daily headaches, neck and back pain.

*Sabillon v. Max Specialty Insurance Company*, 13-513 (La.App. 4 Cir. 3/12/14), 137 So.3d 707, *writs denied*, 08-2471 (La. 12/19/08), 996 So.2d 1133, affirming a jury's general damages award of $3,833,333.00 to a Plaintiff who sustained multiple injuries to the spine, shoulder, and face and a traumatic brain injury was permanent with brain atrophy.

*Wingfield v. State ex rel. Department of Transportation and Development*, 01-2668, 01-2669 (La.App. 1 Cir. 11/8/02), 835 So.2d 785, where the jury's general damages award of $5,000,000.00 was reduced by the court of appeal to $3,000,000.00 to a Plaintiff who sustained a brain injury that left in him a permanent minimally responsive state.

*Odom v. City of Lake Charles*, 00-1950 (La. App. 3 Cir. 1/31/01), 790 So. 2d 51, *writs denied*, 01-1198 (La. 6/22/01), 794 So.2d 787, where this court affirmed a trial judge's general damage award of $4,000,000.00 to a Plaintiff who suffered a severe traumatic brain injury rendering him a quadriplegic and requiring twenty-four-hour care.

*Duncan*, 773 So.2d 670, where the supreme court reduced the jury's $8,000,000.00 general damage award to $6,000,000.00 to an eleven-year-old Plaintiff sustained a traumatic brain injury and severed spinal cord injury rendering her a quadriplegic and totally dependent on others for all her needs.

*Simpson v. State Through Department of Transportation & Development*, 636 So.2d 608 (La. App. 1 Cir. 1993), *writs denied*, 637 So.2d 471, 472 (La. 1994), where the court of appeal found no abuse of discretion in the trial judge's general damage award of $6,000,000.00 to a fifteen-year-old Plaintiff who suffered a severe head injury, amputation of both of his legs, and emotional and psychological problems.

*Marable*, 221 So.3d 880, where the court of appeal found no abuse of discretion in the jury awarding $40,000,000.00 in general damages to a Plaintiff who sustained an anoxic brain injury leaving her in a permanent, minimally conscious state and requiring twenty-four-hour care for the rest of her life. The supreme court denied writs and, thus, did not reduce this award.

To reiterate and if we find the jury abused its discretion in their award of general damages to Sherri, we are tasked with determining the highest amount of general damages award the jury reasonably had within its discretion. In *Barber Bros. Contracting Co., LLC v. Capital City Produce Co., LLC*, 23-788, p. 36, fn. 18 (La. 6/28/24), 388 So.3d 331 358 (This case hereinafter referred to as *Barber I*), the supreme court, when considering general damages in a traumatic brain injury case declined to consider *Marable* stating the $40,000,000.00 in general damages "clearly an outlier." In *Barber I*, the supreme court lowered the jury's general damage award from $10,750,000.00 to $5,000,000.00. On rehearing, in *Barber II*, the supreme court again called *Marable* "an outlier," but noted that the general damages award

30

in *Marable* "was not reduced by this Court." Thereafter, the court reinstated the jury's general damages award of $10,750,000.00.

Here, this court is also left to wrestle with the *Marable* case wherein the supreme court notes the general damages award is an outlier but specifically noted it was not reduced by them. There is certainly a basis to state that the general damages award in *Marable* is a statistical outlier. However, the general damages award of $40,000,000.00 "was not reduced" by the supreme court and is nearly four times the highest general damages award in similar cases we reviewed above in addition to the supreme court's decision in to uphold the general damages award of $10,750,000.00 in *Barber II*.

Important to this issue on appeal, and we note that while the supreme court has within its purview to decline consideration of *Marable* and delineate it an outlier, this appellate court is not free to decline its consideration. "[C]ourts of appeal are bound to follow the last expression of law of the Louisiana Supreme Court." *Francis v. Travelers Prop. Cas. Co. of Am.*, 22-124, 21-816, p. 25 (La.App. 3 Cir. 9/28/22), 349 So.3d 132, 145 (quoting *Oliver v. Magnolia Clinic*, 11-2132, p. 7 (La. 3/13/12), 85 So.3d 39, 44), *writs denied*, 22-1593 (La. 1/11/23), 352 So.3d 984. The supreme court was well aware of the standard of reviewing awards in similar cases, like *Marable*, i.e., as to whether the general damages award of $40,000,000.00 was within the discretion of the jury, and that amount "was not reduced" by the supreme court, thus we are "*bound*" to follow the supreme court. See *Barber II*.

Further, we note the recent case of *Carmouche v. National Union Fire Insurance Company of Pittsburgh, PA*, 25-638 (La.App. 3 Cir. 5/27/26) __ So.3d ___, wherein this court affirmed a general damages award of $25,000,000.00 for the wrongful death of a minor child wherein the parent's suffered survivor and wrongful death damages. While factually dissimilar, we note the general damages awarded in

31

*Carmouche* renders *Marable* less of an outlier when considering general damages awarded in Louisiana cases.

Therefore, should we find the particular facts and circumstances in this case analogous to those in *Marable*, then we are mandated to lower the general damages award to a similar amount as that in *Marable*. Otherwise, this court would violate both directives that we reduce the general damages award to the highest amount the jury reasonably had within its discretion and that we are bound to follow the last expression of law by the supreme court.

Here, and after having reviewed the matter, we find Sherri's general damages award of $155,500,000.00 is so high and excessive that it shocks the conscience of this court. Thus, we find that the jury abused its discretion in its general damages award.

*Highest Amount of General Damages: Particular Facts and Circumstances*

This court has previously considered the particular facts and circumstances in this case when we adjudicated whether the jury abused its discretion in its award of general damages. After considering prior awards, we are again to consider the particular facts and circumstances of the case before us in light of the facts and circumstances present in the case as to the highest prior award, i.e. $40,000,000.00 in *Marable*.

As stated above, the Plaintiff in *Marable* was a sixty-four-year-old with an anoxic brain injury leaving her in a permanent, minimally conscious state requiring twenty-four-hour care for the rest of her life with a remaining life expectancy of twenty-one-years. Here, Sherri is a forty-three-year-old with a traumatic brain injury. She is in a conscious state. She is predicted to continue to deteriorate both physically and mentally. Sherri currently has minimal ability to communicate, and it is likely to worsen eventually to render her with no ability to communicate. She

also requires twenty-four-hour care for the rest of her life, with a remaining life expectancy of forty-four years.

In *Marable*, the Plaintiff was enjoying recent retirement by traveling, attending family gatherings, and involving herself in the lives of her grandchildren. The court noted that she will never be able to enjoy these things again because of her permanent, minimally conscious state.

Here, according to Krystle Johnson, a fellow EMT and coworker, Sherri was "very youthful" and "happy to be on the job." Johnson stated that Sherri "really enjoyed her position that she had. Every patient that she saw, she made sure that she left, like an impression with. She was very, very kind." These sentiments were echoed by Margo Bellard, another fellow EMT and coworker, who characterized Sherri as "always upbeat . . . She loved being a paramedic. She came to work happy. For the most part . . . she was always happy." Bellard told how every shift Sherri would write motivational or uplifting sayings inside of the ambulance. Steven Quebedeaux, Sherri's supervisor, also noted how Sherri "loved her job" and "inspired everyone she worked with."

Jacob Tramble testified that Sherri helped raise his youngest son. He detailed how before the accident, he and Sherri enjoyed traveling, visiting his children in Texas, their parents in Monroe, or traveling to New Orleans and on other vacations.

Unlike the Plaintiff in *Marable*, we note that Sherri has been able to enjoy some of these activities since the accident. However, that ability to enjoy those activities has since ceased. According to the prevailing medical testimony Sherri is in a deteriorating state both physically and mentally. Thus, like the Plaintiff in *Marable*, Sherri has permanently lost all the similar enjoyments of her life cited above.

Like the Plaintiff in *Marable*, Sherri will require twenty-four-hour care for the remainder of her life. Sherri will endure this suffering and require this care for what is expected to be over forty years, from forty-three years of age to seventy-seven years of age. The Plaintiff in *Marable* was sixty-four years old at the time of the accident with a life expectancy of eighty-five, a duration of over twenty years roughly half that of Sherri.

Additionally, the Plaintiff in *Marable* was in a permanent, minimally conscious state. Here, Sherri's suffering is for a greater duration and will come with greater severity, as Sherri will be aware of her deterioration, with an ever-worsening inability to communicate, in a fully conscious state, versus the permanent, minimally conscious state of the Plaintiff in *Marable*. Further, Sherri is developing a progressive worsening of her gait due to right-sided dysfunction versus being in a near vegetative state as the Plaintiff was in *Marable* and is developing Parkinson's-like behavior and dementia.

*Highest Amount of General Damages: Determination by This Court*

After reviewing the particular facts and circumstances in this case and comparing them to those of *Marable*, we find the cases to be analogous. Given the standard of review, controlling jurisprudence, prior awards in similar cases, and particular facts and circumstances of the case before us, we find that the highest amount of general damages award the jury reasonably had within its discretion to award Sherri was $40,000,000.00. We specifically highlight the supreme court's ruling/decision that it "did not reduce" the general damages award in *Marable* when it denied writs of the appellate court's opinion.

Accordingly, we amend the trial court's judgment as follows regarding general damages: past physical pain and suffering from $20,000,000.00 to $5,144,694.53; future physical pain and suffering from $25,000,000.00 to

34

$6,430,868.17; past mental pain, anguish and emotional distress from $20,000,000.00 to $5,144,694.53; future mental pain, anguish and emotional distress from $25,000,000.00 to $6,430,868.17; past & future enjoyment of life from $60,000,000.00 to $15,434,083.61; disability, past and future from $5,000,000.00 to $1,286,173.63, and scarring from $500,000.00 to $128,617.36 so as to reach what we find is the highest reasonable total general damages that can be awarded to equal $40,000,000.00[3].

***ISSUE NUMBER SEVEN: Special Damage Award - Future Medical Expenses***

The special damages award in the judgment for past medical expenses is not an issue raised by any party in this appeal. However, Defendants contend that the award for future medical expenses was grossly excessive in relation to the injuries and life care plan established at trial and should have been remitted or vacated. Defendants ask that this court reverse the award of future life care plan costs and adopt that of Dr. Todd Cowen or remove the added cost attributable to neurologist Dr. David Weir's proposal to provide Sherri with daily twelve-hour care from a Registered Nurse (RN) and daily twelve-hour care from a Licensed Practical Nurse (LPN).

> Special damages are those which have a "ready market value," such that the amount of the damages theoretically may be determined with relative certainty, including medical expenses and lost wages. *McGee v. A C and S, Inc.*, 05-1036 (La.7/10/06), 933 So.2d 770. In reviewing a jury's factual conclusions with regard to special damages, an appellate court must satisfy a two-step process based on the record as a whole: There must be no reasonable factual basis for the trial court's conclusions, and the finding must be clearly wrong. *Guillory v. Ins. Co. of North America*, 96-1084 (La.4/8/97), 692 So.2d 1029.

---

[3] The total general damages awarded in the judgment includes multiple elements: past physical pain and suffering, future physical pain and suffering, past mental pain, anguish and emotional distress, future mental pain, anguish and emotional distress, loss of enjoyment of life, past & future, disability, past & future, and scarring. To adhere to the jury's verdict and the calculations necessary regarding the ratio of each element relative to the total general damages awarded, we reduced each element by 74.2765273% to have the sum of these elements equal the highest reasonable, total general damages that can be awarded, $40,000,000.00.

*Kaiser*, 953 So.2d 802 at 810.

When legal error indicts the fact-finding process, the manifest error standard of review no longer applies. *Said v. Federated Rural Elec. Ins. Exch.*, 21-78 (La. 4/20/21), 313 So.3d 1241. Thereafter, if the record is otherwise complete, the appellate court conducts a de novo review on the issue. *Id.* A Plaintiff seeking future medical expenses has the burden to prove that certain future medical expenses will more probably than not be incurred. *Menard v. Lafayette Ins. Co.*, 09-1869 (La. 3/16/10), 31 So.3d 996.

In this case, Defendants challenge the medical necessity of one item in the life care plan of Mr. Stony Landry, that Sherri's twenty-four-hour care be administered by RNs for twelve hours and LPNs for the remaining twelve hours of each day as recommended by Dr. Weir. Defendants dispel Dr. Weir's view that Certified Nursing Assistant (CNA) care is insufficient for Sherri. Defendants note that CNAs are healthcare professionals who provide basic patient care, such as bathing, feeding, and monitoring vitals, under the supervision of an RN or LPN. Their services come at significantly less costs than the services of LPNs or RNs.

Dr. Weir's recommendation of using RNs and LPNs for twelve hours per day was used as a basis for the life care plan composed by Mr. Landry. Plaintiff's expert accountant, John Theriot, opined that the cost of Mr. Landy's life care plan would be in the range of $55,629,665.00 to $61,433,984.00, stating:

> Q. []you came up with two numbers. You came up with a low end number of fifty-five million, six hundred twenty-nine thousand, six hundred and sixty-five dollars [$45,629,665], correct?
>
> A. Correct.
>
> Q. And then you came up with a high end number of [] Sixty-one million four hundred thirty-three thousand, nine hundred eighty-four dollars [$61,433,984], correct?
>
> A. Correct, yes.

Dr. Weir originally recommended twelve-hour CNA care and twelve-hour LPN care for Sherri for the rest of her life, as illustrated below:

> Q.    And that's when you recommended twelve hour CNA care, twelve hour LPN care?
>
> A.    Correct.

However, Dr. Weir changed this recommendation to daily twelve-hour RN care and twelve-hour LPN care for Sherri. Dr. Weir explained this change in that he asked Shannon Daniel, Sherri's nurse case manager, and Blasia Rivet, nurse and owner of Decision Critical, the company currently providing Sherri with 24-hour care, to give him as assessment of what level of care Sherri needed. Dr. Weir was prompted to ask this of the nurses based on what transpired on a June 11th visit wherein Sherri locked out her caregiver. The following is Dr. Weir's testimony regarding what he understood transpired on the June 11th visit (emphasis added):

> Q.    So tell us what was going on Dr. Weir?
>
> A.    Yes, so I met with Shannon Daniel, who was her Nurse Case Manager, and Ms. Blasia Rivet, who is a nurse there and owner of the Decision Critical business; and we started talking about some events that occurred. In other words, there was many things that they were kind of-- enlightened me to at that time, but they told me about one specific event where, you know, *the CNA, the Certified Nurse Assistant shows up at her house, and well, Sherri had locked her out of the house.* And apparently, you know, they had some conflict, and she took a bunch of Benadryl and went to sleep and the lady couldn't, you know, get her to open the door, and so basically, she was locked out of the house and they kind of thought it may have been intentional.

After relaying his understanding of the June 11th events, Dr. Weir went on to testify as follows regarding CNAs, medications, and what the nurses recommended as to the daily level of care Sherri needed (emphasis added):

> And then [Sherri] and her husband felt that, you know, the CNAs really couldn't help her very much, because one of the things about CNAs, if they're going to be at your house and they're going to take care of you, basically they're kind of housekeepers and maybe they can cook for you, or maybe they can, you know, just help you with your activities of daily living, but they can't fool with your medications. *By law they*

*can't help you.* Like in other words, if you're having problems at home, they can't recommend, hey, why don't you take this pill, give you these medicines. That's really not legal, and so they weren't able to help her with her medicines, so they kind of felt like they weren't getting the kind of help that they needed with the CNA. They were more happy with the LPN's at night, who could do some of those things, and so they expressed their unhappiness with that to the RNs.

And so [the nurse case manager and nurse owner] felt that [Sherri] really needed, you know, some twenty-four hour care and we talked about, you know, what should we do to improve the level of care for a while and see what was absolutely, actually needed. So I asked them to go in and determine the level of care needed that would actually take care of her problem. So you know, *being that [CNAs] couldn't give medicines*, and this lady was having these excruciating headaches during the day and we were using some pretty sophisticated medications at that point, we felt like an RN during the day needed to be there, to understand the situation with her medications was probably the most appropriate thing to do to be able to see the patient, see what's going on from a clinical point of view, make a medical decision and give her the medication, on, as well, so sometime that medication might be an inhaler. Sometime that medication might be a pill under the tongue, and so-- and she, you know, would get an injection once a month; and so we felt that the RN was the higher level of care that she needed to be able to make these more critical, medical decisions during the day, and then the LPN could take care of her at night.

. . . .

Q.    And so on that day, that's when you decided, look, I'm going to put RNs in her house, 24/7 for a couple of weeks, let me get some information back, get a base on her. I need to figure out what is happening in her house and what is her level of functioning, correct?

A.    That's correct, yes.

Q.    Okay. And if we jump forward to her next visit on page five sixty-six, still in June, you get some reports back from the nurses on the types of things that are going on, correct?

A.    That's correct, yes.

Q.    And for instance, one of the things you found out is she was supposed to be taking Gabapentin medicine and she's supposed to take it morning, noon and night, and she was just getting up in the morning and taking all three pills at once?

A.    Yes, well there was multiple things that was identified, you know, by the RNs and that's one of them. They found pills on the floor that was supposed to have been taken. On various occasions, they found a box of medication on the floor in one of her closets in her home, and

they said, well, you know, what is this? I mean, you know, is this something she should have took, or is this something she's periodically taking . . .

Based the above, Dr. Weir changed his recommendation for Sherri's daily care from twelve-hour CNA care and twelve-hour LPN care to using RNs and LPNs each for twelve hours per day. To reiterate, this recommendation was used as a basis for the life care plan composed by Stony Landry and Landry's life care plan was used by Theriot to calculate the cost of Sherri's life care plan which the jury awarded in this case.

Defendants argue that Dr. Weir's change is based on his error of applicable law and a mistake of fact. Regarding Dr. Weir's error of law, Defendants point out that Dr. Weir stated that CNAs were prohibited by law from administering medication. This is incorrect, according to Defendants, citing La.R.S. 37:1032:

> Direct service workers may perform any or all of the following tasks for an individual who is in stable condition only when the task may be performed according to exact directions and there is no need to alter the standard procedure and the results are predictable:
>
> (1) Administration of oral and topical medication, ointments, suppositories, or a pre-measured dosage unit provided by the manufacturer of an oral inhalant aerosol as ordered by an authorized prescriber. Any medication administered by a direct service worker under this Part shall be in a container which meets acceptable pharmaceutical standards and is marked with clear instructions, the prescriber's name, the prescription number, if any, and the name of medication, dosage, and route. Under no condition shall a direct service worker administer medications not in compliance with the provisions of this Section.
>
> (2) Provision of routine hydration, nutrition, or medication by way of an established gastro-tube.
>
> (3) Other non-complex tasks which may be delegated by the registered nurse to the direct service worker pursuant to rules promulgated pursuant to this Part.

As highlighted above, Dr. Weir does state that CNAs "can, you know, just help you with your activities of daily living, but they can't fool with your

39

medications. By law they can't help you" and, further, states "[s]o you know, being that [CNAs] couldn't give medicines."  Dr. Weir's testimony regarding his belief about CNAs and medication administration is highlighted as follows:

> Q.    And a CNA is someone— a Certified Nursing Assistant can prompt somebody to take their medications, correct?
>
> A.    They can maybe prompt them, but they can't give them the medication. They can't handle the medication, and they can't make a decision about them getting the medication. They can say, hey, you know, don't you need to take your medicine, something like that to-- well, matter of fact, but they can't do anything beyond that.

It is clear from the excerpts above that Dr. Weir was under the mistaken belief that CNAs could not handle medications under Louisiana law despite La.R.S. 37:1032's authorization to do so.  Further, it is also clear that Dr. Weir's decision to recommend RNs and LPNs only was based on a mistake of fact as to who Sherri locked out when she may or may not have purposefully locked out her caregiver.  As highlighted above, Dr. Weir thought the locked-out caregiver that day was a CNA; however, he corrected himself as shown with the following:

> Q.    And you remember, you corrected me in the deposition, it wasn't a CNA, it was an LPN, correct, that was locked out of the house?
>
> A.    I think it was, yes.

Finally, it is clear from Dr. Weir's testimony that a multitude of daily tasks necessary for Sherri's care can be done by a CNA, as illustrated by the following:

> Q.    So-- but just so we're clear, you don't need a registered nurse with high skill level care to-- to make her meals or cook for her, or dress her, correct?
>
> A.    No.
>
> Q.    That can be done by a CNA, correct?
>
> A.    Yes.
>
> Q.    And time during the day, leisure time, watching TV, you don't need a high skilled level care for that, do you?

A.     Well, you know, it depends. Okay. I would say that depends, because if she has some clinical changes, then that nurse has to be available, right, to help her to make the decisions about her medications, because she surely can't make the decisions about her medications at this point.

Q.     So you're recommending that she watch TV with a registered nurse?

A.     No, not watch TV, but the registered nurse needs to be available to her to help her decide which one of these medications she's going to take and things of that nature, you know, somebody of a higher caliber than a CNA.

Q.     And a good, properly trained CNA can't call an RN or call a Neurologist like you, if they see a problem?

A.     They're not likely to get in touch with a Neurologist like me, I wouldn't think, you know, by on spur of the moment and then, you know, I think even the idea of getting in touch with the RN immediately is a bit far fetched, but you know, is it possible, sure, yes.

Q.     If we have a plan that's recommended for $3,000 a day, you can't incorporate an on call RN in that plan?

A.     I guess that's possible, you know.

This testimony is such that the reasoning Dr. Weir used to change his recommendation is based on a mistake a law that CNAs cannot handle or administer medications and a mistake of fact that it was a CNA Sherri locked out on June 11th.

The propriety of using CNAs to care for Sherri was addressed by Dr. Todd Cowen, Defendants' expert. Dr. Cowan does life care plans largely for Plaintiffs in litigation but did not do so in this matter. Regarding the need for Sherri to have daily twelve-hour RN and LPN care, Dr. Cowan testified to the following:

Q.     Stony Landry prepared a report as a life care planner based upon what he received from the doctors, Dr. Weir, and recommended, based upon Dr. Weir's input, attending care of twelve hours of CNA care and twelve hours of LPN care. Did you agree with that?

A.     Yeah. If she were to need twenty-four-hour care, I did not agree with it in that fashion.

Q.     Yeah. Explain -that for us, please?

A.     So, there's different levels of home care. There's nursing care, then there's attending care. The attending care is going to be to help with a person's ability to perform activities of daily living, which has been reported that she has difficulty with some of those skills. It's also for safety and supervision, and so a CNA, a Certified Nursing Assistant, will be the person that would provide that. Nursing level care is going be more of a skilled level, which for the ADL's and for the safety and supervision, the CNA is what is required, and the best person to do it, frankly. So, it doesn't require a nurse.

. . . .

LPNs set up the medications. The CNAs did most of that work. It's just like at home. If someone has home health and they need medications, it's not a nurse there twenty-four hours a day. Nurses, again, help set up the medications for family, sitters, etc, to handle.

. . . .

Q.     . . . Now, we looked at one last report of yours, and that came after Dr. Weir had recommended in June of 2024, he had then recommended to Stoney Landry that the care be increased from a skill level of CNA twelve to LPN twelve to RN twelve, and LPN twelve. Did you agree with that assessment?

A.     I did not. No, sir.

Q.     Did you think that was-- that was excessive?

A.     I do. There's no reason that for whatever skilled need she would need, being set up the medications, and having that supervised, there's no reason why an LPN couldn't do that part of it.

Q.     And that's—that's based on your twenty to thirty years running brain injury rehabilitation units?

A.     Yeah. The rehab unit I ran for twenty-one years. Of course, I've written thousands of home health orders in my career. So, I'm very familiar with it.

Q.     And is this the biggest life care plan you've ever seen?

A.     Probably yes. Yes, sir.

After reviewing the evidence above, we find that errors by Dr. Weir, most notably the error of law that CNAs cannot handle medications, interdicted the fact-finding process of both Dr. Weir and the jury. When legal error indicts the fact-

42

finding process, the manifest error standard of review no longer applies. *Said*, 313 So.3d at 1241.

Therefore, we vacate the finding that Sherri's life care plan must include twelve hours of RN care.

Once a court finds that an error of law interdicts the fact-finding process, if the record is otherwise complete, the appellate court conducts a de Novo review on the issue. *Id.* Here, we find that the record before us is complete. Accordingly, we will conduct a de Novo review regarding Sherri's life care plan.

*De Novo Review: Sherri's Life Care Plan*

A Plaintiff seeking future medical expenses has the burden to prove that certain future medical expenses will more probably than not be incurred. *Menard*, 31 So.3d 996. As such, we will first determine whether Plaintiff has proven Sherri needs 24-hour care for the remainder of her life, and, if so, what level of care is appropriate in that level of care plan such a life care plan will involve. Thereafter, we will amend the judgment to reflect the proper costs associated with that life care plan.

The only evidence in the record that Sherri does NOT need 24-hour care is from the report of Stacie Nunez, a vocational rehabilitation counselor and lifecare planner hired by Defendants. We specifically note that Ms. Nunez's report did not provide for any home care for Sherri whatsoever. However, Ms. Nunez admitted that her plan was based on past recommendations of examining physicians, not treating physicians, that Sherri was currently receiving twenty-four-hour care, and that her plan did not account for what Sherri's treating physicians were recommending in the future. Further, Ms. Nunez's report was based on the recommendations of the examining physicians, those physicians whose opinions the jury gave little credence.

Additionally, Ms. Nunez's report is contradicted by that of Mr. Stony Landry. Mr. Landry found that Sherri does need twenty-four-hour care for the remainder of her life. His findings are based on the recommendations of Sherri's treating physicians.

The following exchange took place between Nunez and Plaintiff's counsel:

Q.    [A]s long as Ms. Tramble continues treating with the doctors that have been taking care of her this entire time, her medical costs moving forward for the rest of her life would not be accounted for in your plan, correct?

A.    Correct.

It is clear from the verdict that the jury, after reviewing the contradicting testimony, chose to give greater weight to Sherri's treating physicians than that of the other examining physicians in each area of the judgment.

After reviewing the record, we agree with the jury and give more credence to the report of Mr. Landry and opinion of Dr. Weir. Therefore, we find that Plaintiff has carried the burden to prove that Sherri will require twenty-four hour care and she will incur medical expenses for twenty-four-hour care for the rest of her life. This finding is parallel to the findings of the jury and also proper and supported by the evidence in this case. While above we find the basis for Dr. Weir to suggest the highest level of RN care for Sherri's twenty-four-hour care was not proper for Sherri's life care plan, we do find that Dr. Weir's recommendation that Sherri receives twenty-four-hour care is appropriate and supported by the record.

Therefore, and having found Sherri in need of twenty-four-hour care, we will now look at the proper level of care according to the evidence in the record and the costs associated with Sherri receiving that care. Defendants cite costs of life care plans in other cases such as *Marable*, 221 So.3d 880, *Stutes v. Greenwood Motor Line, Inc.*, 07-52, 17-567, 17-568 (La.App. 3 Cir. 11/22/17), 234 So.3d 75, and

44

*Marks v. OHMEDA, Inc.*, 03-1446 (La.App. 3 Cir. 3/31/04), 871 So.2d 1148, *writs denied*, 983 So.2d 1019, 1020. Unlike the standard of reviewing general damages, such comparisons are not relevant in this de novo review. Our review is limited to the record before us and the level of care proper for Sherri.

Dr. Weir initially recommended twelve-hour CNA care and twelve-hour LPN care for Sherri for the rest of her life. Even after changing that recommendation to daily twelve-hour RN and twelve-hour LPN care for Sherri, Dr. Weir testified that incorporating an RN on call while using CNAs in such a life care plan was possible.

Nunez testified that using Mr. Landry's CNA costs of $19.00 - $24.00 per hour, twenty-four hours a day for the remainder of Sherri's life, totaling 354,780 hours, would cost $6,740,820.00 to $8,514,720.00 towards Sherri's life care plan.

Landry testified that Sherri is currently receiving RN Case Management Services from Decision Critical at $150.00 per hour. Landry checked NSI Nursing Specialties and they were also $150/hour for RNs. Landry, looking to the costs of LPN care found a range of $100.00 to $125.00 per hour. John Theriot used the amounts found by Landry to calculate the costs of Sherri's life care plan with a low and high amount listed.

Here, the jury chose to award an amount based on Landry and Theriot's "high cost" life care scenario using the hourly cost of LPNs at $125.00. Again, and in an effort to respect the jury's award, we will do the same. Further, we find that Sherri carried her burden to prove a need for LPN care at least twelve hours per day versus twenty-four hours per day of CNA care, with RN supervision.

Dr. Weir's original opinion regarding the need for LPN care was based on the ever fast-changing symptoms and medical needs in Sherri's care, noting symptoms an LPN would recognize, while a CNA may not. Additionally, an LPN can adjust medications immediately if the need arises, while a CNA is only allowed to

45

distribute medications as directed. Accordingly, we will use the following in calculating the cost of Sherri's life care plan: RN care at $150 per hour; LPN care at $125 per hour, and; CNA care at $24 per hour.

After a de novo review, and to find a reasonable life care plan for Sherri, we find Sherri's life care plan will entail one hour of RN care per day to be on call and to provide oversight, twelve hours of LPN care per day, and twelve hours of CNA care per day. The cost of one hour of RN care per day at $150.00 per hour for 14,782.5 days remaining at the time in Sherri's life expectancy totals $2,217,375.00. The cost of LPN care at $125.00 per hour for 177,390 hours remaining at the time in Sherri's life expectancy totals $22,173,750.00. The cost of CNA care at $24.00 per hour for 177,390 hours remaining at the time in Sherri's life expectancy totals $4,257,360.00. After adding these figures, the total amount we award Plaintiff for one hour daily of RN care, twelve hours daily of LPN care, and twelve hours daily of CNA care for 14,782.5 days totals $28,648,485.00.

Plaintiff was awarded $26,608,500.00 for RN care and $22,173,750.00 for LPN care for a total of $48,782,250.00 in the judgment before us. The difference between $48,782,250.00 awarded and $28,648,485.00 under the plan we render totals the sum of $20,133,765.00. Therefore, we amend the trial court's judgment awarding future medical care by reducing the award of $61,433,984.00 by $20,133,765.00 to the total sum of $41,300,219.00 for Sherri's life care plan.

## ISSUE NUMBER EIGHT: Application of Louisiana Civil Code Article 3071

Defendants assert in this final issue raised for review that the trial court erred as a matter of law in refusing to incorporate terms into the judgment of a compromise reached under La.Civ.Code Art. 3071 in a settlement based on the case of *Gasquet v. Commercial Union Insurance. Co.*, 391 So.2d 466 (La.App. 4 Cir. 1980), *writ denied*, 396 So.2d 921, 922 (La. 1981).

"A compromise is a contract whereby the parties, through concessions made by one or more of them, settle a dispute or an uncertainty concerning an obligation or other legal relationship." La.Civ.Code art. 3071. To be enforceable under Article 3071, a compromise must either (1) be reduced to writing or signed by the parties or their agents, or (2) be recited in open court and be capable of transcription from the record of the proceeding. *Lavan v. Nowell*, 98-284 (La. 4/24/98), 708 So.2d 1052.

The second amended final judgment was "entered against Defendants, JOSHUA BRISCOE, as the employee in course and scope of employment as stipulated by the parties; LINETEC SERVICE, LLC, as the vicariously liable employer as stipulated by the parties; and ARCH INSURANCE COMPANY, as insurer of the employer, Linetec Services, LLC, together with all taxable costs allowed by law and legal interest from the date of judicial demand of June 8, 2022, until paid."

Defendants ask that this court amend the second amended final judgment to include recognition of the settlement agreement wherein Briscoe and Linetec's liability was limited to the extent of available insurance. Contrarily, Plaintiff asks that this court exercise the law of the case doctrine to decline consideration of this issue. As we cited above,

> [t]he law of the case principle relates to (a) the binding force of trial court rulings during later stages of the trial, (b) the conclusive effects of appellate rulings at the trial on remand, and (c) the rule that an appellate court will ordinarily not reconsider its own rulings of law on a subsequent appeal in the same case.

*Petition of Sewerage & Water Bd. of New Orleans*, 278 So.2d at 83. The law of the case doctrine is discretionary, not a rigidly applied mandate. *State v. La. Land & Expl. Co.*, 347 So.3d 684.

Plaintiff argues that this court can apply the law of the case doctrine as it considered this issue in two separate writ applications, numbers 24-638 and 25-133.

47

In writ application 24-638, we found that an adequate remedy was available via ordinary appeal. As such, we did not consider the merits of this issue in that writ. Likewise, in writ application 25-133, this issue was not presented for review, as that writ application adjudicates the propriety of the amount the trial court required of Defendants in an appeal bond.

Thus, we decline to exercise the law of the case doctrine, as we find it does not apply. Accordingly, we will further consider the issue.

Appellate courts are courts of record and, as such, may not review evidence that is not in the appellate record, nor may an appellate court receive new evidence. La.Code Civ.P. art. 2164. "Evidence not properly and officially offered and introduced cannot be considered, even if it is physically placed in the record. Documents attached to memoranda do not constitute evidence and cannot be considered as such on appeal." *Denoux v. Vessel Mgmt. Servs., Inc.*, 07-2143, p. 6 (La. 5/21/08), 983 So.2d 84, 88

Here, the written settlement was not offered into evidence. While the settlement agreement is physically in the record, it was only as an attached exhibit to Briscoe and Linetec's memorandum in support of their motion regarding the bond for appeal. Accordingly, we cannot consider the attachment's merits or impact on these proceedings.

While we cannot consider the written compromise, as it is not properly part of the record, Defendants argue that Plaintiff entered into a settlement agreement on the record in open court. Under La.Civ.Code art. 3072, a compromise may be found if "recited in open court, in which case the recitation shall be susceptible of being transcribed from the record of the proceedings." Defendants argue that was the case here and support this argument by pointing to the following exchange in open court:

Ms. Webre: On behalf of the Allied World layer, the Navigators layer, the Gemini layer, the Markel layer and the Admiral layer.

. . . .

In exchange for a complete release of the insured's [sic] from any uninsured liability, we have got an agreement…
Counsel for Linetec/Arch: Do the Plaintiffs have anything they want to put on the record?

Counsel for Plaintiff: I don't think that there's any additional terms.

Counsel for Linetec/Arch: I haven't seen anything about this settlement agreement in writing, and I don't know the terms with respect to my client, Linetec, and/or with respect to Josh Briscoe.

. . . .

I have to be [ensured] that Linetec is protected to whatever this agreement is, and I just don't know the terms of it.

Counsel for Plaintiff: Linetec, has not been released from all liability. His client, Linetec, has been released from liability that is above any insurance coverage that might exist, so his client has tons of liability that's still to be adjudicated, which is going to be adjudicated in this trial[.]

. . . .

Josh Briscoe doesn't have any liability above insurance coverage, so there's no personal exposure whatsoever, and his attorney has cut him a deal and got him out of any risk of personal exposure.

Counsel for Linetec/Arch: I don't understand why there's any difference between Josh Briscoe and Linetec. I haven't seen the settlement agreement, and I don't know, and I don't think it's enforceable[.]

. . . .

[T]hey tell me Linetec is protected. I - - this settlement needs to be confected properly so that Linetec is, in fact, protected and Josh Briscoe is protected.

It is clear from the excerpt above that any compromise was not "susceptible of being transcribed from the record of the proceedings." Counsel for Linetec and Arch had not seen or been informed of any terms in the compromise. Moreover, as counsel for Plaintiff continually pointed out, Linetec was not a party to any alleged

49

compromise that had been confected at that time. Accordingly, we find no merit to this issue presented for review.

## RECAPITULATION

In summation, we deny Plaintiff's motion dismiss Linetec's appeal; find no error by the trial court: in denying Defendants' motion for continuance; in excluding the expert testimony of John B. Everlove; in limiting Defendants' pretrial discovery of Sherri's OB/GYN records or as to Plaintiff's American Express telephone conversations; in instructions of the jury regarding Louisiana seat belt law, Sherri's interdiction, or the *Housely* presumption; in denying Defendants' motion for a mistrial based on the jury composition being reduced to less than twelve; or in failing to recognize the *Gasquet* settlement terms in its final judgment.

However, we do find error in the general damages and future medical awards, and, thus, we amend the judgment before us as follows:

| | |
|---|---|
| Past medical expenses | $ 885,991.13 |
| Future medical care and expenses | $ 41,300,219.00 |
| Past lose wages and income | $ 215,447.00 |
| Future lost wages and income | $ 1,707,503.00 |
| Past physical pain and suffering | $ 5,144,694.53 |
| Future physical pain and suffering | $ 6,430,868.17 |
| Past mental pain, anguish and emotional distress | $ 5,144,694.53 |
| Future mental pain, anguish and emotional distress | $ 6,430,868,17 |
| Loss of enjoyment of life, Past & Future | $ 15,434,083.60 |
| Disability, Past & Future | $ 1,286,173.63 |
| Scarring | $ 128,617.36 |
| **TOTAL:** | **$ 84,109,160.10** |

## CONCLUSION

Jacob Tramble, on behalf of Sherri Tramble, moves to have the appeal of Linetec Service, LLC dismissed. We deny this motion. Joshua Briscoe and Linetec Service, LLC raised a total of fifteen assignments of error. We affirm the trial court's judgment as to the following: denying the motion for continuance as related to Briscoe's representation and due process; exclusion of expert evidence by John B. Everlove; denial of pretrial discovery of Sherri Tramble's OB/GYN medical records and telephone conversations with American Express; proper jury instructions regarding Louisiana seat belt laws, Sherri Tramble's interdiction, and the *Housely* presumption; denying a motion for mistrial based on jury composition of less than twelve, and denying a request to include language recognizing the pretrial settlement agreement limiting Joshua Briscoe and Linetec Service, LLC's liability for the resulting judgment to the extent of available insurance coverage available.

We find merit to the assignments of error related to the general damage award and future medical award. Accordingly, we amend the trial court's judgment award to $40,000,000.00 in general damages and $41,300,219.00 in future medical expenses, respectively.

Costs related to this appeal are to be paid by Defendants, Joshua Briscoe and Linetec Service, LLC.

**MOTION DENIED; JUDGMENT AFFIRMED, AS AMENDED.**

**SHERRI TRAMBLE**

**VERSUS**

**JOSHUA BRISCOE, ET AL.**

FITZGERALD, J., dissents in part with assigned reasons and concurs in part.

I respectfully disagree with the majority as to the appropriate amount of general damages: $40,000,000.00 exceeds the highest amount that could reasonably be awarded under the facts of this case.

I concur with the majority in all other respects.